PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA 92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff

Electronically FILED by
Superior Court of California,
County of Los Angeles
11/22/2023 11:02 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By D. Jackson Aubry, Deputy Clerk

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| JOSE LICEA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TUFT AND NEEDLE, LLC, a Delaware entity d/b/a WWW.TUFTANDNEEDLE.COM,<br><br>Defendant. | Case No. 23STCV28947<br><br>**CLASS ACTION COMPLAINT** |

## INTRODUCTION

Defendant secretly enables and allows a third-party to wiretap and eavesdrop upon the private conversations of everyone who communicates through the chat feature at www.tuftandneedle.com (the "Website"). The company then exploits and monetizes that data by sharing it with other third parties, who use the private chat data to bombard the unsuspecting visitor with targeted marketing.

Defendant does this without visitors' informed consent. As a result, Defendant has violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630 *et seq.*

## JURISDICTION AND VENUE

1. As a Court of general jurisdiction, This Court has jurisdiction over all matters presented to it per the mandates of the California Constitution.

2. Venue is proper in this County because numerous class members reside in this County.

3. Defendant is subject to jurisdiction under California's "long-arm" statute found at California Code of Civil Procedure Section 410.10 because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States." Indeed, Plaintiff believes that Defendant generates a minimum of eight percent of its national website sales to Californians, such that the website "is the equivalent of a physical store in California." Since this case involves illegal conduct emanating from Defendant's operation of its website targeting Californians, California courts can "properly exercise personal jurisdiction" over the Defendant in accordance with the Court of Appeal opinion in *Thurston v. Fairfield Collectibles of Georgia*, 53 Cal.App.5th 1231 (2020).

## PARTIES

4. Plaintiff is a resident and citizen of California. In 2023 and while physically within California, Plaintiff visited Defendant's Website using a smart phone and conducted a brief conversation with an agent of Defendant through the Website's chat feature. Plaintiff was not advised that the chat was monitored, intercepted, or recorded, nor did he consent thereto.

5. Defendant is a Delaware entity that sells bedding products throughout the United States and in this County. Defendant also owns, operates, and/or controls the Website.

# FACTUAL ALLEGATIONS

### A. Background of CIPA.

6. CIPA prohibits both wiretapping and eavesdropping of electronic communications without the consent of all parties to the communication. "'[T]he right to control the nature and extent of the firsthand dissemination of [one's] statements'" is viewed by the California Supreme Court "as critical to the purposes of Section 631[.]" *Javier v. Assurance IQ, LLC*, 2023 WL 114225, at *6 (N.D. Cal. Jan. 5, 2023) (Breyer, J.) (quoting *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985)); *Ribas*, 38 Cal. 3d at 360-61 ("a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device"). "[U]nder Section 631, it has always mattered who is holding the tape recorder[.]" *Javier*, 2023 WL 114225, at *6.

7. Compliance with CIPA is easy, and most website operators comply by conspicuously warning visitors if their conversations are being recorded, intercepted, or eavesdropped upon.[1]

8. Unlike most companies, Defendant *ignores* CIPA. Instead, Defendant enables and allows a third party that has no corporate affiliation with Defendant to eavesdrop on all such conversations. Why? Because, as one industry expert notes, "*Live chat transcripts are the gold mines of customer service. At your fingertips, you have valuable customer insight to make informed business decisions. . . .When people are chatting, you have direct access to their exact pain points.*"). See https://www.ravience.co/post/improve-marketing-roi-live-chat-transcripts (last visited November 2023) (emphasis added).

9. Defendant's actions are not incidental to facilitating e-commerce, nor are they undertaken in the ordinary course of business. To the contrary, as noted above, Defendant's actions violate industry norms and the legitimate, reasonable expectations of consumers.

---

[1] https://www.leechtishman.com/insights/blog/the-california-invasion-of-privacy-act-californias-wiretap-act/ ("*[C]ompliance [with CIPA] is not difficult. A business must take certain steps, as part of its privacy program, to ensure that **any time the business is gathering**, either automatically, or **with a chat feature, personal data of a consumer/website visitor, that it obtains valid consent consistent with the holdings and determinations of the courts interpreting CIPA** and other applicable Data Privacy laws.*") (last visited November 2023) (emphasis added).

B. **Defendant Allows HelpScout to Intercept Consumers' Chats During Transmission.**

10. To enable the eavesdropping, Defendant has allowed a third party, HelpScout, to covertly embed its chat technology code into Defendant's chat feature. HelpScout's software creates a transcript of each chat session.

11. As a user chats on the Website, Defendant permits and enables HelpScout to intercept the incoming chats in real-time.

12. In other words, before the chat even gets to Defendant, HelpScout is intercepting it, copying it, and then forwarding it along to Defendant. The chats meant for Defendant are first routed *through* HelpScout.

13. As shown above, the secret code is a type of automatic routing software that automatically acquires and transmits user chat communications to HelpScout without any active input from either Defendant's employees, agents, or human representatives, or HelpScout's employees, agents, or human representatives.

14. One might reasonably wonder why HelpScout would be interested in intercepting and recording the Website chat interactions between Defendant and unsuspecting visitors to Defendant's Website. As shown below, it all about money.

15. The HelpScout software is integrated with social media platforms like Facebook. The integration allows various software sub-systems to share data to operate as a unified system. According to Bloomberg.com, this is all part of Meta's secret "plan to profit from private chats." As Bloomberg explained, Meta's software integration "can manage customer messages from multiple services on one central dashboard. That's central to Meta's plan to make money off of its two messaging apps, WhatsApp and Messenger." *See* https://www.bloomberg.com/news/articles/2022-02-15/meta-closes-1-billion-kustomer-deal-after-regulatory-review (last visited November 2023) (emphasis added).

16. So how does it work? First, Meta identifies "user interests" by monitoring a collection of "offsite" user activity such as website visits and interactions (including private chat communications between Defendant and visitors) by "integrating" its software with HelpScout's

- 4 -
CLASS ACTION COMPLAINT

software. Second, Meta generates revenue by selling advertising space through its subsidiaries' ability to identify those offsite user interests. Third and finally, after the chat transcripts intercepted by HelpScout are provided to Meta through "integration", Meta brands like Facebook and WhatsApp bombard the unsuspecting Website visitors with targeted advertising based upon the user's Website visits, chats and interactions.

17. Through the preceding acts, Meta subsidiaries can freely boast that they can "Transform your support center into a profit generator by bulk messaging specific customer segments based on your unique data...to reengage dissatisfied customers." *See* https://www.kustomer.com/product/customer-service/ (last visited November 2023). Indeed, all of the schemers – Defendant, HelpScout, and Meta – profit from secretly exploiting the chat data through targeted social media advertising because targeted advertising allows brands to send different messaging to different consumers based on what the brand knows about the customer. The better a brand can demonstrate that it understands what its customers want and need, the more likely customers respond to advertising and engage with the brand.

18. As such, HelpScout does more than merely provide a storage function for Website users' chat communications with Defendant. It is more than the proverbial "tape-recorder" in the hand of Defendant. Instead, HelpScout uses its record of Website users' interactions with Defendant's chat feature for data analytics and marketing/advertising to consumers. HelpScout's exploitation, monetization, use of, and interaction with the data it gathers through the chat feature on Defendant's Website in real time makes it a third-party interceptor and eavesdropper known to and enabled by Defendant under section 631(a), rather than a mere extension of Defendant and/or party to the communication with Website visitors.

19. Defendant did not inform Class members that Defendant was secretly allowing, aiding, and abetting HelpScout to intercept and eavesdrop on the conversations during transmission, or that HelpScout provided data from such transcripts to Meta and similar entities through "integration" of their softwares.

20. Defendant did not obtain Plaintiff's or the Class members' express or implied consent for the preceding intrusions, nor did Plaintiff or Class members know at the time of the conversations

of Defendant's conduct.

21.  Going from bad to worse, Defendant has also installed intrusive spyware on its website. With Defendant's assistance, the spyware companies deliberately surveil internet users via their digital and online existence. They track in real time and record indefinitely the personal information of third parties and monetize products and services derived from this data. Plaintiff lacks a direct relationship with the spyware companies and has no reasonable or practical basis upon which to consent to Defendant's surveillance.

22.  Defendant has enabled and aided the spyware companies to track Plaintiff's activity across hundreds of websites. The tracking mechanisms, including "cookies," "pixels," and code, transmit to the spyware companies unique identifiers used to associate Plaintiff's browsing history with other data compiled into a data profile about Plaintiff.

23.  The spyware companies deploy proprietary "cookies" which are pieces of software code stored on Internet users' web browsers and collect information regarding Internet use. When an Internet user visits Defendant's webpage, Defendant assists the spyware companies to gather and transmit information including the unique user ID, IP address, session time, number of sessions or visits, the URL or websites an Internet user has visited (e.g., Referrer and Origin headers), hyperlinks clicked, and documents downloaded. The spyware companies use algorithmic data processing to infer a wide range of behavioral traits and information that it attributes to individual Internet users through persistent identifiers or other personal information of the Internet users—including their consumer preferences, income levels, and their politics.

24.  The spyware companies also utilize a proprietary software code to "extract," or intercept, "user attributes," which include the contents of users' communications with Defendant's website, which secretly sends the information to the spyware companies while users are in the process of communicating with the website. Defendant facilitates this by deploying the code on Internet users' electronic devices when they visit Defendant's website. Through this practice, Defendant assists the spyware companies in intercepting substantive communications between internet users and Defendant's website, including the URLs being browsed by the Internet user as well as the referrer URL; the webpage title; webpage keywords; the exact date and time of the website visit; the IP

address of the user's computer; product page visits; "purchase intent" signals; "add-to-cart actions"; and data entered by the user into forms on the website.

25. Another tool utilized by the spyware companies digital tracking efforts are "tracking pixels." Tracking pixels are pieces of code that are embedded into webpages and are essentially invisible to Internet users because they are hidden within the code of a webpage and activate (or "fire") whenever the page is opened, regardless of and prior to any pretense of consent. Tracking pixels cannot be disabled. The spyware companies' cookies and tracking pixels are pervasive throughout the Internet. The spyware companies have agreements with numerous high-traffic websites like Defendant. By blanketing popular websites with these tracking tools, the spyware companies reach a substantial percentage of Internet users.

26. Embedded in the HTML on Defendant's website is JavaScript code used for syncing and matching user data across numerous platforms.

27. The spyware companies harvesting data from Defendant's website users during the class period include at least Klaviyo, Hot Jar, and Black Crow AI. There are likely other companies doing the same thing, but that information is only available to Defendant at this time but will be revealed in discovery.

## CLASS ALLEGATIONS

28. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> **All persons within the state of California who visited Defendants website and whose privacy was violated as described above.**

29. NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

30. COMMONALITY: Common questions of fact and law exist as to all Class Members, and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined

without reference to the individual circumstances of any Class Member, include but are not limited to the following:

a. Whether Defendant caused electronic communications from class members with the Website to be recorded, intercepted, and/or monitored by a third party;

b. Whether Defendant aided and abetted the third party in eavesdropping on such communications;

c. Whether Plaintiff and Class Members are entitled to statutory penalties; and

d. Whether Class Members are entitled to injunctive relief.

31. <u>TYPICALITY</u>: As a person who visited Defendant's Website and whose privacy was invaded and whose chat was recorded, intercepted and eavesdropped upon without prior knowledge or consent, Plaintiff is asserting claims that are typical of the Class.

32. <u>ADEQUACY</u>: Plaintiff will fairly and adequately protect the interests of the members of The Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

33. <u>SUPERIORITY</u>: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

### CAUSE OF ACTION

**Violations of the California Invasion of Privacy Act**

**Cal. Penal Code § 631(a)**

34. Section 631(a) of California's Penal Code imposes liability upon any entity that "by means of any machine, instrument, contrivance, or in any other manner," (1) "intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system," or (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to

read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state" or (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained" or (4) **"who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."** (emphasis added).

35. Here, Defendant "aids, agrees with, employs, [and] conspires with [HelpScout]" to willfully, and without the consent of Plaintiff or other members of the class, to read and learn the contents and meaning of the chat communications of the Website users while in transit within this state. Defendant and HelpScout then use and communicate the information so obtained with yet more parties to target and specifically market to Plaintiff and the class for Defendant's and HelpScout's own monetary gain.

36. Section 631 of the California Penal Code applies to internet communications and thus applies to Plaintiff's and the Class's electronic communications with Defendant's Website. "Though written in terms of wiretapping, Section 631(a) applies to Internet communications. It makes liable anyone who 'reads, or attempts to read, or to learn the contents' of a communication 'without the consent of all parties to the communication.' *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. 2022).

37. HelpScout's software embedded on the Website by Defendant to record and eavesdrop upon the Class's communications qualifies as a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct alleged herein.

38. At all relevant times, Defendant intentionally caused the internet communication between Plaintiff and Class Members with Defendant's Website to be recorded by HelpScout in real time.

39. Plaintiff and Class Members did not expressly or impliedly consent to any of Defendant's actions.

40. Defendant's conduct constitutes a violation of the fourth clause of Cal. Penal Code § 631(a), entitling Plaintiff and Class Members to injunctive relief and statutory damages.

- 9 -
CLASS ACTION COMPLAINT

## SECOND CAUSE OF ACTION

## CALIFORNIA INVASION OF PRIVACY ACT

## PENAL CODE SECTION 638.51

41. Section 638.51 of the Penal Code provides that it is illegal to "install or use a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53." (Penal Code § 638.51(a).) A "'Pen register' means a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication. (Penal Code § 638.50(b).)

42. Defendant aided and abetted several spyware companies to use a pen register to access and obtain Plaintiff's IP address on Plaintiff's device. *See Greenley v. Kochava*, 2023 WL 4833466, at *15-*16 (S.D. Cal. July 27, 2023) (Bashant, J.). Plaintiff did not consent to Defendant's actions.

43. Plaintiff suffered both an economic injury and an intangible injury to Plaintiff's dignity caused by the violation of Plaintiff's right to privacy.

44. Plaintiff is entitled to statutory damages of $5,000. *See* Penal Code § 637.2(a)(1).

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class counsel;
2. An order declaring Defendant's conduct violates CIPA;
3. An order of judgment in favor of Plaintiff and the Class and against Defendant on the causes of action asserted herein;
4. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;
5. Statutory damages pursuant to CIPA;
6. Prejudgment interest;
7. Reasonable attorneys' fees and costs; and

8. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

Dated: November 22, 2023

PACIFIC TRIAL ATTORNEYS, APC

By: _____
Scott. J. Ferrell
Attorneys for Plaintiff